IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AJAY ENDEAVORS, INC., ANKUSH
BIKKASANI TRUST, AWARE
INVESTMENTS LTD., D MEHTA LLC,
RADHA KANURI REVOCABLE
TRUST, RAMAKRISHNA KANURI
REVOCABLE TRUST, TEJ
BIKKASANI TRUST,

          *Plaintiffs,*

    v.

DIVVYMED, LLC, *doing business as*
divvyDOSE, PENZO ENTERPRISES,
LLC, ARVIND MOVVA.

          *Defendants.*

No. 1:20-cv-01556-SB

---

Kathleen M. Miller, SMITH, KATZENSTEIN, & JENKINS LLP, Wilmington, Delaware; Massimo D'Angelo, AKERMAN LLP, New York, New York.

          *Counsel for Plaintiffs.*

Raymond J. DiCamillo, Christine Dealy Haynes, RICHARDS, LAYTON & FINGER, PA Wilmington, Delaware; Christopher Andrews, Walker Newell, COOLEY LLP, San Francisco, California

          *Counsel for Defendants.*

---

**MEMORANDUM OPINION**

January 10, 2022

BIBAS, *Circuit Judge*, sitting by designation.

Honesty may be the best policy. But healthy skepticism is a close second. Investors sue a company and its CEO for lying about their investment. Though they had already caught him lying once, they signed contracts without reading closely. So their reliance on his statements was not reasonable. I thus dismiss some of their claims for securities fraud and mutual mistake. And because they signed contracts, I dismiss their claims for unjust enrichment too.

## I. BACKGROUND

On this motion to dismiss, I take the complaint's factual allegations as true. Divvymed is a new online pharmacy that goes by divvyDose. Am. Compl., D.I. 25 ¶ 47. It needed money to get off the ground. Its CEO knew where to turn: a group of doctors that his dad had known for decades. *Id.* ¶¶ 5–7, 49.

The CEO met with the doctors and promised them eight-fold returns. *Id.* ¶ 11. So in 2018, the doctors rushed to invest, wiring the CEO millions before ever seeing a contract. *Id.* ¶¶ 54–55, 59–63. They would come to regret it.

### A. The first investment

But first, some financial jargon. Regular debt is simple. I lend you money; you pay me back, usually with interest. Convertible debt is different. I lend a company money. But before I do, we agree on "triggering events." If a triggering event happens, any money the company still owes me (the balance) "converts" into shares of the company.

Investors like convertible debt because it is less risky than stocks. Suppose I buy stock in a company whose share price later plummets to zero. I lose all my money. Now imagine that I had bought convertible debt instead. If the company tanks, I can

ask it to repay me, recouping my investment plus some interest. But if it soars, stocks in the company might be worth more than the debt. At that point, I can convert, profiting on the difference. In short, convertible debt gives me the best of both worlds—the reliability of debt and the potential of stocks.

Back to this case. The doctors bought convertible debt in divvyDose. D.I. 25 ¶ 58. They believed that if the company was sold, their oustanding debt would convert into shares of divvyDose; sale would be a triggering event. But their contracts said otherwise: if the company was sold, divvyDose would pay the doctors one-and-a-half times any outstanding balance. Defs.' Decl. re Mot. To Dismiss, D.I. 28, Ex. A at 2; D.I. 25 ¶ 64. Because they would get their balance plus 50%, I call this term the 50%-payout provision.

### B. The second investment

The doctors did not discover this discrepancy until May 2019, when the CEO returned to ask for more money. He explained that their old debt would convert to stock if they invested again. D.I. 25 ¶¶ 68–69.

To study the proposal, the doctors compared it with the terms of their 2018 notes. *Id.* ¶¶ 72–73. For the first time, they noticed the 50%-payout provision. So they confronted the CEO. He apologized, claiming that the payout provision had been an oversight. *Id.* ¶¶ 73, 75. And he promised to "rectif[y]" the problem by redoing the contracts, this time ensuring that a sale would trigger conversion. *Id.* ¶¶ 73, 77.

The CEO did issue "revised notes" to the doctors, but never replaced the 50%-payout provision to which they had objected. *Id.* ¶¶ 77, 83, 85. Perhaps because the

doctors trusted the CEO, they again failed to notice this error. So they signed the revised, "corrected" notes and separately agreed to invest more. *Id.* ¶ 89.

Eight months later, the CEO sold divvyDose. *Id.* ¶¶ 98, 103. The doctors' debt did not convert into divvyDose shares. Instead, under the 50%-payout provision, they got their loan repaid plus half of the outstanding debt. In the end, the doctors' return was far less than the eightfold windfall that the CEO had allegedly promised them. *Id.* ¶¶ 92–93.

Disappointed, the doctors sue. They focus on two of the CEO's lies: his promise to delete the 50% payout language and his promise that sale would trigger conversion. *Id.* ¶ 112. They allege securities fraud, unjust enrichment, and mutual mistake. The CEO and divvyDose move to dismiss every claim.

To survive that motion, the doctors must state a plausible legal claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## II. THE DOCTORS FAIL TO PLEAD SECURITIES FRAUD

**A. Since the doctors' reliance was unreasonable, they fail to plead securities fraud**

The doctors claim they invested in divvyDose only because the CEO lied. So they sue for securities fraud. Because this theory relies on two lies, I take each in turn.

When the CEO agreed to revise the original notes, he promised to delete the 50%-payout provision. The doctors claim, as they must, that they relied on that promise to sign the revised notes. *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*,

908 F.3d 872, 879 (3d Cir. 2018). But reliance must be reasonable. *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178–79 (3d Cir. 2003). Here, it was not.

True, some of the doctors had known the CEO for a long time. *Id.* (longstanding personal relationships tend to show reasonable reliance). But countervailing factors are decisive. First, the CEO did not owe the doctors a fiduciary duty. *Simons v. Cogan*, 549 A.2d 300, 303 (Del. 1988). Second, the doctors were sophisticated. *AES Corp.*, 325 F.3d at 178–79 (sophistication matters). Indeed, they had already noticed the same exact error in the first notes. Since they had spotted trouble once, they could have done so again. *Id.* ("opportunity to detect the fraud" matters). And they had a strong incentive to doublecheck the revised notes because they would have made more money. Plus, they never say that they lacked time to read the revised notes or seek counsel. *Id.* (access to relevant information matters). So the doctors' reliance was unreasonable.

The doctors' next theory suffers the same flaw. They say that the CEO lied when he told them the debt would convert if he sold divvyDose. But again, their reliance was unreasonable. After all, the CEO's promise was contradicted by the 50%-payout language in the notes they signed. And they understood that language because they had objected to it before. So I dismiss these claims without prejudice.

### B. Many of the remaining claims fail too

The doctors bring two other claims against divvyDose and the CEO—one for unjust enrichment and another for mutual mistake. Both fail, at least as to one doctor.

Start with the doctors' claims for unjust enrichment. They say divvyDose and its CEO profited at their expense by misleading them. D.I. 22 ¶ 122. But that claim fails

5

because "a contract already governs the parties' relationship." *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012). Delaware plaintiffs can sue for unjust enrichment only if they lack an adequate remedy at law. *Tornetta v. Musk*, 250 A.3d 793, 813 (Del. Ch. 2019). But the doctors signed notes (contracts) that supply exactly that: legal remedies. *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 943 (Del. 1979). So I dismiss this claim without prejudice. The doctors can revive this theory by somehow arguing that fraud voided their investment contracts.

The doctors also sue for mutual mistake, which lets courts rewrite contracts that depart from the parties' shared understanding. To state that claim, the doctors must allege "justifiable reliance." *Midcap Funding X Trust v. Graebel Cos., Inc.*, 2020 Del. Ch. LEXIS 171, at *61 (Apr. 30, 2020). And there is no justifiable reliance when (as here) the relevant contracts have "anti-reliance and integration provisions." *Id.*; D.I. 28, Ex. A at 8. But divvyDose produced only two contracts for one of the doctors. D.I. 28, Ex. A at 8, Ex. D at 9; *see also Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[C]ourt[s] may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."). I cannot yet say if the other notes had similar provisions. So I dismiss the one doctor's mutual mistake claims with prejudice, and let all the others proceed.

And if divvyDose unearths the other doctors' contracts and they contain similar provisions, I will dismiss their claims too.

6

\* \* \* \* \*

Investors must take some care to understand what they sign. This is especially true when millions are on the line and investors have already caught the drafter in a lie. The doctors did not take such care. So I dismiss many of their claims.

Defendants have asked me to let them move for sanctions. *See* Fed. R. Civ. P. 11(b). But they do not need my permission. *Id.* R. 11(c)(2). I do remind them, however, that Rule 11 motions must themselves comport with Rule 11.