IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AJAY ENDEAVORS, INC.; ANKUSH
BIKKASANI TRUST; AWARE
INVESTMENTS LTD.; RADHA
KANURI REVOCABLE TRUST;
RAMAKRISHNA KANURI
REVOCABLE TRUST; TEJ
BIKKASANI TRUST,

        *Plaintiffs*,

    v.

DIVVYMED, LLC, *doing business as*
divvyDOSE; PENZO ENTERPRISES,
LLC; ARVIND MOVVA,

        *Defendants*.

No. 20-cv-1556-SB

---

Kathleen M. Miller, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Massimo D'Angelo, AKERMAN LLP, New York, New York.

*Counsel for Plaintiffs.*

Raymond J. DiCamillo, Christine Dealy Haynes, RICHARDS, LAYTON & FINGER, PA Wilmington, Delaware; Christopher Andrews, COOLEY LLP, San Francisco, California.

*Counsel for Defendants.*

---

**MEMORANDUM OPINION**

---

March 27, 2023

BIBAS, *Circuit Judge*, sitting by designation.

Under Delaware law, a party to a contract cannot sit idly by if he knows that his counterparty is signing the contract with a mistaken belief about what it says. Plaintiffs plausibly allege that defendant Arvind Movva did just that: sat on his hands while plaintiffs signed agreements to invest in his company, thinking that the agreements said one thing when they really said another.

Of course, plaintiffs were not entitled to act unreasonably. They had a duty to act in good faith and in accordance with reasonable standards of fair dealing. But that duty is a fact-intensive affirmative defense, so I deny defendants' motion to dismiss.

## I. BACKGROUND

On this motion to dismiss, I take all well-pleaded facts as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Along with the complaint itself, I may consider materials "incorporated by reference or integral to the claim." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). Those materials include the parties' revised 2018 investment agreements. These agreements contain the alleged mistake, and the complaint repeatedly refers to them. *See, e.g.*, Second Am. Compl., D.I. 47 ¶¶ 21, 28, 31–33.

An August 2019 email chain between plaintiffs and Movva is also integral. Plaintiffs extensively quote these emails. *See, e.g., Id.* ¶¶ 29, 34. 43. They also say the emails show a specific meeting of the minds, a necessary element of a mistake claim. *See id.* Plus, plaintiffs previously agreed to my considering these materials. *See* D.I. 46. So I consider the complaint, the revised 2018 notes, and the August email chain.

2

On to the facts: divvyDOSE is an online pharmacy. Second Am. Compl., D.I. 47 ¶ 19. When its founder, Arvind Movva, needed money to get the company off the ground, he turned to his dad's coworkers. *Id.* ¶ 22. In 2018, those coworkers (plaintiffs here) invested millions. *Id.* ¶ 21. Their 2018 investments took the form of convertible debt: upon a triggering event, plaintiffs' loans would convert to divvyDOSE shares. *Id.* ¶ 21.

In 2019, Movva asked for $5 million more. *Id.* ¶ 23. He told plaintiffs that a sale of divvyDOSE was imminent and would make them eight to ten times their investment. *Id.* ¶ 25. As proof of the potential return, he pointed to the recent sale of a divvyDOSE competitor for $1 billion. *Id.* ¶ 23.

But as plaintiffs were contemplating the second investment, they discovered an issue with the first. *Id.* ¶ 28. Plaintiffs had thought that, under the original 2018 notes, divvyDOSE's sale was a triggering event. *Id.* ¶¶ 28–30. In other words, they thought that if divvyDOSE were sold, their return would be based on a conversion to divvyDOSE shares. *Id.* They would thus get a percentage of the sale's proceeds. But the 2018 notes, which plaintiffs had not read, said otherwise: in the event of a sale, plaintiffs would get their investments back, plus 50% of the amount outstanding on their loans. *Id.*

After discovering this 50%-payout provision, plaintiffs confronted Movva. *Id.* ¶ 29. He apologized and promised to re-issue the notes without it. *Id.* ¶¶ 29–32. Under the revised 2018 notes, he said, a sale would count as a triggering event. *Id.* And if conversion were triggered, plaintiffs' notes would convert to divvyDOSE shares with the

3

company's valuation capped at $75 million. *Id.* This cap made sure that plaintiffs' stake in the company would not get too diluted even if the company's value surged. Movva also agreed that the new, 2019 investments would convert to shares upon divvyDOSE's sale. *Id.* ¶¶ 29–32.

Movva sent plaintiffs draft agreements for the 2019 and revised 2018 notes. *Id.* ¶ 33. He assured plaintiffs that he had taken a "more active role" in drafting them. *Id.* ¶ 34.

A few days later, one of the investors, Radha Kanuri, reviewed the agreements on a phone call with Movva. *Id.* ¶ 35. Plaintiffs allege that on this call, Movva said the agreements reflected the changes they had discussed. *Id.* ¶¶ 35, 39. After the call, Kanuri emailed another plaintiff-investor, saying that he had reviewed the agreements with Movva and that they addressed his concerns. *Id.* ¶ 36. Plaintiffs then signed the revised 2018 and 2019 agreements.

About a year later, divvyDOSE was sold. *Id.* ¶ 52. But plaintiffs did not get the payday they were expecting. Though their 2019 notes converted to shares, their revised 2018 notes did not. *See* D.I. 65 at 1. Instead, they found out that the 50%-payout provision remained. *Id.* ¶ 37. To be sure, the revised 2018 agreements did add the $75 million valuation cap that Movva had promised. *Id.* ¶ 43. But they did not add divvyDOSE's sale to the category of events that would trigger conversion. *Id.*

So plaintiffs sued to recover the amount they would have made had their revised 2018 notes converted to shares upon divvyDOSE's sale. Previously, I dismissed with prejudice their fraud claims, plus one plaintiff's mutual-mistake claims. D.I. 39;

4

D.I. 40. Plaintiffs then stipulated to dismissing the remaining mutual-mistake claims and filed an amended complaint alleging unilateral mistake. *See* Second Am. Compl., D.I. 47; D.I. 48. Defendants now move to dismiss.

## II. PLAINTIFFS' UNILATERAL-MISTAKE CLAIM SURVIVES

On a motion to dismiss, I ask whether, accepting all well-pleaded facts as true, plaintiffs have stated a claim to relief "that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiffs must "state with particularity the circumstances constituting … mistake." Fed. R. Civ. P. 9(b). But they may allege mental states, like knowledge of the mistake, generally. *Id.*

### A. Plaintiffs plausibly state a claim for unilateral mistake

To state a claim for unilateral mistake under Delaware law, plaintiffs must show that (1) they were "mistaken about the contents of the final, written agreement," (2) Movva knew of the mistake but said nothing, and (3) there was a "specific meeting of the minds regarding a term that was not accurately reflected in the final written agreement." *In re 11 W. Partners, LLC*, 2019 WL 1300859, at *5 (Del. Ch. Mar. 20, 2019); *see also Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 679–80 (Del. 2013). Plaintiffs plausibly allege all three with sufficient particularity.

1. *Mistake.* First, plaintiffs plausibly allege that they were mistaken about the revised 2018 notes' terms. Plaintiffs thought those notes would convert to shares upon divvyDOSE's sale. Second Am. Compl., D.I. 47 ¶ 37. True, if they had read the notes (Kanuri only "reviewed" them with Movva), they would have discovered their mistake. *See* D.I. 50-2 at 3; Second Am. Compl., D.I. 47 ¶ 36. But under Delaware law,

5

failing to read a contract does not bar a claim for unilateral mistake. *Scion*, 68 A.3d at 676–77.

2. *Knowledge of mistake.* Second, plaintiffs plausibly allege that Movva knew of their mistake but said nothing so he could benefit from it. Movva took an "active role" in drafting the revised notes. Second Am. Compl., D.I. 47 ¶ 34. So it is plausible that he knew that those notes would not convert to shares upon divvyDOSE's sale.

It is also plausible that he knew that plaintiffs were in the dark. They had complained to him when they found the 50%-payout provision in the original 2018 notes. *Id.* ¶ 29. Indeed, they say that this provision was the very reason the notes were revised and re-issued. *See id.* ¶ 45.

Plus, Movva had good reason to keep his mouth shut. As plaintiffs were executing the revised notes, Movva was "very close to completing a deal" to sell divvyDOSE. Second Am. Compl., D.I. 47 ¶ 49. Limiting plaintiffs' payout would mean more money for Movva.

Defendants insist that Movva could not have known of plaintiffs' mistake because Kanuri said that the revised agreements addressed his concerns. *See* D.I. 52 at 14–15. But Kanuri's statement was explicitly premised on having "reviewed [the contracts] *along with* Arvind [Movva]." D.I. 50-2 at 3 (emphasis added); *see* Second Am. Compl, D.I. 47 ¶ 36. If Movva misled Kanuri on that call, as plaintiffs say he did, then Movva would have known that Kanuri was mistaken.

3. *Prior meeting of the minds.* Third, plaintiffs plausibly allege that the parties "came to a specific prior understanding that differed materially from the written

6

agreement." *Glidepath Ltd. v. Beumer Corp.*, 2018 WL 2670724, at *13 (Del. Ch. June 4, 2018) (internal quotation marks omitted). Plaintiffs identify a specific term that should have been cut: the 50%-payout provision. Plus, they say that the 2019 notes accurately reflect their agreement about conversion. So I know "exactly what terms to insert in the contract rather than being put in the position of creating a contract for the parties." *Id.* (internal quotation marks omitted).

And plaintiffs plausibly allege that the parties had agreed to the revisions. Plaintiffs say that in late August 2019, they discovered the 50%-payout provision and complained to Movva by email. Second Am. Compl., D.I. 47 ¶¶ 28–30. Movva responded, they say, by apologizing, claiming that it was an "oversight," and assuring them that it would be deleted. *Id.* ¶¶ 29–30. Thus, plaintiffs allege the circumstances constituting the mistake with sufficient particularity: we know what was said (the 50%-payout provision would be removed and their debt would convert to shares), when it was said (late August 2019), who said it (Movva), and how and where it was said (by email). *See Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (plaintiffs "must specify the who, what, when, where, and how" (internal quotation marks omitted)).

Defendants counter that, "[i]n context, … Movva plainly was not referring to the [50%-payout provision]" when he apologized and agreed to a correction. D.I. 52 at 12. But defendants do not explain what else it could have been. *See id.* True, the emails are not as clear as plaintiffs make them out to be. *See* D.I. 54-1. There is no explicit mention of the 50%-payout provision. *Id.* And there *is* explicit mention of the $75

7

million valuation cap, so it is possible that Movva was simply agreeing to add the cap and nothing more (which he did). But the emails do discuss "anti-dilution language" in the event of a divvyDOSE "sale," which would be irrelevant if the 50%-payout provision remained. *See id.* at 4 (discussing "sale of the entire company"), 5 (discussing "scenarios of future investments and acquisitions"), 7 (discussing what would happen if divvyDOSE was "sold"). So it is possible that Movva was agreeing not just to add a valuation cap but to delete the payout provision too.

Plus, other conversations were interspersed with these emails. *See, e.g.*, Second Am. Compl., D.I. 47 ¶¶ 25, 35; D.I. 54-1 at 3. These conversations could add context to the emails, showing that plaintiffs and Movva were clearly discussing the 50%-payout provision. So I cannot say that these emails "contradict [plaintiffs'] allegations" such that they "control." *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 112 (3d. Cir. 2018). Instead, I accept plaintiffs' allegations as true: Movva agreed that divvyDOSE's sale would be a triggering event under the revised 2018 notes.

Down the line, plaintiffs will have to show a specific meeting of the minds by "clear and convincing evidence." *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1152 (Del. 2002); *see Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 712 (Del. 2019). Crossed wires will not suffice. I can reform the contracts only if Movva clearly agreed that the revised 2018 notes would convert to equity upon divvyDOSE's sale.

### B. No affirmative defense bars plaintiffs' claims at this stage

Plaintiffs are not out of the woods just yet. Defendants also say that plaintiffs' claims are barred because plaintiffs failed to act in good faith and in accordance with reasonable standards of fair dealing. But this good-faith-and-fair-dealing argument

8

is an affirmative defense, not an element of unilateral mistake. *See Scion*, 68 A.3d at 679–80 (listing elements of unilateral mistake). So it "may not afford the basis for a dismissal … under Rule 12(b)(6)" unless it is "apparent on the face of the complaint." *Bethel v. Jendoco Const. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978).

Defendants say that the complaint clearly shows that Kanuri lied and thus acted in bad faith. But defendants distort what Kanuri said. He did not say, as defendants claim, that he had "read" the contracts. D.I. 52 at 17. He said that he had "reviewed" them with Movva. D.I. 50-2 at 3.

True, even if Kanuri did not lie, plaintiffs' conduct might still have been so unreasonable as to bar reformation. For a point of comparison, consider *Scion*. There, the plaintiff did not read the contract that contained the mistake. *Scion*, 68 A.3d at 677. But he had read an earlier version of it. *See id.* at 677–78. And he had asked his advisors to read the contract and inform him of any significant changes. *Id.*

Here, by contrast, plaintiffs do not allege that they read *any* version of the contract. *Cf. id.* at 677 n.41 (reserving the question whether plaintiff would have satisfied the good-faith-and-fair-dealing standard "if he had failed to read the first agreement"). Nor do they allege that they were relying on lawyers or advisors to review the contracts for them. Worse still, after discovering the mistake in the original 2018 notes, plaintiffs still did not check to make sure it was fixed in the revised versions. *See* Second Am. Compl., D.I. 47 ¶ 36. It would not have been burdensome to check; the provision was one prominent paragraph on the note's second page, not a tiny detail buried in boilerplate or obscured by legalese. *See* D.I. 50-2 at 48 §2(c). Plus,

Movva specifically asked plaintiffs to check the contracts to make sure that their concerns had been addressed. *See* D.I. 50-2 at 4–5. So there is good reason to think that plaintiffs acted unreasonably here.

Still, it is not appropriate for me to throw out their suit just yet. Whether plaintiffs acted in good faith and in accordance with reasonable standards of fair dealing is a fact-specific inquiry that requires me to go beyond the pleadings. I cannot do that at this stage.

### C. Nor does any anti-reliance clause bar plaintiffs' mistake claims

Finally, defendants say that plaintiffs' unilateral-mistake claims are barred by an anti-reliance clause. Indeed, in my previous opinion, I said that the relevant contracts had an anti-reliance clause that barred plaintiffs' mutual-mistake claims. *See* D.I. 39 at 6. But I have "inherent power" to reconsider my interlocutory orders "when it is consonant with justice to do so." *In re Energy Future Holdings Corp.*, 904 F.3d 298, 310 (3d Cir. 2018) (internal quotation marks omitted). And after revisiting the contracts and Delaware law, as well as reviewing the parties' supplemental briefing, I find that the clause is not an anti-reliance clause but a standard integration clause. So it does not bar plaintiffs' mistake claims.

An anti-reliance clause is a "*clear and unambiguous* contractual provision in which the plaintiffs forthrightly affirm that they are not relying upon any representation or statement of fact not contained within the [final agreement]." *Kronenberg v. Katz*, 872 A.2d 568, 591 (Del. Ch. 2004) (emphasis added); *see also Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1058–59 (Del. Ch. 2006) ("[M]urky

10

integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations.").

The provision here contains no such affirmation. It says that the parties will not be liable or bound "by any representations, warranties, covenants and agreements except as specifically set forth herein." *See, e.g.*, D.I. 50-2 at 55 §5(*o*). It does *not* say that the parties did not rely on extra-contractual representations when deciding whether to sign the notes. *Compare id., with MidCap Funding X Tr. v. Graebel Cos.*, 2020 WL 2095899, at *7 (Del. Ch. Apr. 30, 2020) ("Each … of the parties hereto further expressly agrees and acknowledges that it is not entering into this Agreement in reliance upon any representations, promises or assurance other than those expressly set forth in this Agreement."). And "Delaware Courts have concluded that similar clauses stating … that 'neither [the parties] nor their agents shall be bound by any terms, conditions, or representations not herein written' do not amount to clear anti-reliance language." *Sanyo Electric Co. v. Intel Corp.*, 2021 WL 747719, at *13 (Del. Ch. Feb. 26, 2021).

Plus, I doubt that Delaware courts would hold that an anti-reliance clause automatically bars a mistake claim of this kind. When the mistake is about what is in the contract, it "by definition involves a party who has not read, or thought about, the provisions in [the] contract carefully enough." *Scion*, 68 A.3d at 676 (internal quotation marks omitted). So it makes little sense that a clause in the contract that the

11

party necessarily admits to not having read (or read carefully enough) could bar his claim.

This, of course, does not mean that plaintiffs acted reasonably when they signed the contracts. But plaintiffs' reasonableness, as explained, is an inappropriate question to resolve at this stage. Their unilateral-mistake claim thus survives, for now.

### D. Plaintiffs may re-plead their mutual-mistake claim

Because there is no anti-reliance clause, I also grant plaintiffs leave to amend their complaint to revive their mutual-mistake claims.

Defendants say that even if I find that there is no anti-reliance clause, I should not allow plaintiffs to plead both mutual and unilateral mistake because those claims are "inherently inconsistent." D.I. 67 at 6. I disagree. Rule 8(d) of the Federal Rules of Civil Procedure lets a party "state as many separate claims … as it has, regardless of consistency." Fed. R. Civ. Pro 8(d). So, if they wish, plaintiffs may add back their mutual mistake claims.

\* \* \* \* \*

Plaintiffs plausibly state a claim for unilateral mistake. And no affirmative defense is apparent on the face of their complaint. So I deny defendants' motion to dismiss.