IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AJAY ENDEAVORS, INC., ANKUSH
BIKKASANI TRUST, AWARE INVEST-
MENTS LTD., RADHA KANURI REVO-
CABLE TRUST, RAMAKRISHNA
KANURI REVOCABLE TRUST, and
TEJ BIKKASANI TRUST,

        *Plaintiffs*,

    v.

DIVVYMED, LLC d/b/a divvyDOSE,
PENZO ENTERPRISES, LLC, and
ARVIND MOVVA

        *Defendants*.

No. 1:20-cv-01556-SB

---

Michael J. Joseph, LAW OFFICE OF JOYCE LLC, Wilmington, Delaware; Raja Devineni, San Francisco, California

        *Counsel for Plaintiffs.*

Raymond J. DiCamillo, Christine D. Haynes, RICHARDS, LAYTON & FINGER, PA, Wilmington, Delaware; Ryan Blair, COOLEY LLP, New York, New York; Christopher Andrews, COOLEY LLP, San Diego, California.

        *Counsel for Defendants.*

---

**MEMORANDUM OPINION**

January 17, 2025

BIBAS, *Circuit Judge*, sitting by designation.

Parties must read their contracts carefully. Two doctors invested in an online pharmacy startup, buying complex debt instruments that could convert to stock. Despite that complexity, the doctors never read the investment contracts, so they missed a term that limited their upside. When the company was sold, the doctors got several hundred thousand dollars in profit. But they were not satisfied. They sued the online pharmacy, its parent company, and its founder, alleging that the founder had misled them in negotiating the investment. They claim that they are entitled to a few million dollars more than they got. Not so. Discovery reveals that they cannot prove their unilateral-mistake claim, plus they acted unreasonably. I grant defendants summary judgment. I also grant in part defendants' motion to exclude the plaintiffs' expert report.

**I. TWO DOCTORS INVESTED IN A STARTUP, MADE A TIDY RETURN, AND THEN SUED**

Arvind Movva founded an online pharmacy, DivvyDose, that delivers packets of pills to patients. Third Am. Compl., D.I. 72 ¶ 9. Movva needed money for the company, so he turned to two doctors who were family friends. *Id.* ¶ 22; D.I. 128-1 at 30. The two doctors, Purna Bikkasani and Ramki Kanuri, invested in DivvyDose through the entities that are plaintiffs in this suit. D.I. 128 at 5. They had invested in several other companies together before. D.I. 126-1 at 30 (tr. 48:16–23).

The doctors bought $2.65 million of convertible debt in DivvyDose. Third Am. Compl., D.I. 72 ¶ 21. Convertible debt starts out like a normal bond but can convert to equity if certain conditions are met. *See* D.I. 119-1 at 69–74. The debt agreement spells out what those conditions are. Convertible debt combines the risk profiles of

2

debt and equity investments: It guarantees investors interest payments at first, but can transform into equity. Equity has greater upside but also greater downside because debtholders get paid before shareholders. *Id.*

Though DivvyDose's lawyers sent the debt contracts, the doctors signed without reading. D.I. 126-1 at 122–29; D.I. 126-1 at 35 (tr. 82:1–12); D.I. 126-1 at 85 (tr. 113:10–11). Bikkasani explained, "I did not even ask what are the terms of the investment. I said, 'Ok, I'll invest it.'" D.I. 126-1 at 35 (tr. 82:2–4). He added that when he got the contract documents, "I didn't even look at them. Believe me. I didn't even look at them. I signed it electronically." D.I. 126-1 at 35 (tr. 82:7–9). When referring to one important part of the contract, Kanuri stated: "I don't believe I looked at any of this." D.I. 126-1 at 85 (tr. 113:10–11).

Had they read those documents, they would have noticed two provisions that specify how the debt could convert to equity. D.I. 126-1 at 99–100, 111–12. First, a majority of the debtholders could vote to convert it when the debt matured; and second, it would automatically convert if the company raised $5 million or more by issuing new equity. *Id.*

The contract also contained a change-of-control provision. If the company merged or was sold while the debt was outstanding, the doctors would get all their principal back, plus unpaid accrued interest, plus an extra 50% of the outstanding principal amount. D.I. 126-1 at 100, 112. Movva even emailed Bikkasani stating, "those who invest in the current note get an immediate 50% return if there is a majority sale

3

while the notes are out." D.I. 128-1 at 71. The parties call this clause the 50%-payout provision.

A year later, Bikkasani emailed Movva, asking that the "convertible bonds be converted to equities in the company." D.I. 128-1 at 4–5. Movva explained "the notes … are not yet convertible. Conversion limits some upside potential for those in the note." D.I. 128-1 at 4–5. But Movva then made a new offer: If the two doctors would invest more in the company, they could trigger conversion based on issuing more than $5 million of new equity. D.I. 126-1 at 150. The doctors first seemed excited about that idea. D.I. 126-1 at 154. But then they demanded more, including a board seat because "EARLY CAPITAL ALWAYS COMES AT HIGHER RISK AND HENCE SHOULD BE REWARDED MUCH BETTER." D.I. 126-1 at 180 (emphasis in original). The two sides kept haggling. D.I. 126-1 at 182–209, 218–22. Despite these complex negotiations involving millions of dollars, the two doctors asked only "a dear friend" who worked in finance to review the documents and never "sought a legal or professional opinion" about the investments. D.I. 126-1 at 211.

As the negotiations wound on, Kanuri began worrying about "the risk of additional investment" being "higher than the upside." D.I. 126-1 at 217. He wanted "full protection for [his] current investment." *Id.* So he proposed a more conservative investment option: a Simple Agreement for Future Equity note, which the parties call a SAFE note. *Id.* at 217–18. Movva agreed that this option was "a great vehicle" and "way less confusing and complex" than the other types of investments they had

4

discussed. *Id.* at 217. DivvyDose's lawyers sent the SAFE documents to both doctors. D.I. 126-1 at 229, 232.

They also amended the convertible notes. D.I. 126-1 at 251, 263. The new notes cancelled out the old ones and made only one substantive change: a $75 million valuation cap. If the two doctors' notes converted to equity, the maximum valuation for purposes of their conversion would be $75 million; that prevented them from being diluted. *Id.* at 251–52, 263–64. The same payout provision from the original note remained, meaning that if the company was sold, the doctors would receive their principal, plus interest, plus an extra 50% of their outstanding principal. *Id.* at 252, 264. This 50%-payout provision capped the doctors' upside in case of a sale: rather than get potentially unlimited upside as an equity investor, the convertible debt would pay out only a 50% bonus on the doctors' initial investment. The two doctors represented that they had "knowledge and experience in financial and business matters that" made them "capable of evaluating the merits and risk of this investment." D.I. 126-1 at 255, 267.

Yet the doctors again failed to read the contracts. One said he "wasn't paying attention" to the negotiations. D.I. 126-1 at 38 (tr. 114:12–13). He added that, though he got the contract, he neither read nor understood it all. *Id.* (tr. 114:20–23). The other thought "there was never a question that I had to read this. I just trusted [Movva's] word." *Id.* at 91 (tr. 222:21–22).

In January 2020, about four months after the doctors signed the new investment, another pharmacy company offered to buy DivvyDose. *See* D.I. 126-1 at 5 (tr. 56:9–

5

13); D.I. 126-1 at 229, 232, 251, 263. That deal closed in September 2020. D.I. 126-1 at 4 (tr. 55:24). The doctors got back their principal, plus interest, plus the 50% bonus on their principal. In total, one doctor profited by $750,000 and the other by $575,000. D.I. 72 at 12.

But that was not enough. Soon after, the doctors filed this lawsuit. D.I. 1. They alleged that they were underpaid because they were entitled to $2.1 and $1.6 million. D.I. 72 at 12. They alleged that they had made a unilateral mistake in the contract negotiation. D.I. 72 at 10. They claimed that Movva misled them by representing that the 50% cap would be removed in the new note and that Movva and DivvyDose knew the cap should be removed but left it in the note contract anyway. D.I. 72 at 10–11. They also brought a claim for mutual mistake, but now concede that they cannot prove it. D.I. 128 at 24. The unilateral-mistake claim survived defendants' motion to dismiss because no affirmative defense was apparent on the face of the complaint. D.I. 69 at 12. But plaintiffs' claim does not survive summary judgment.

## II. I GRANT SUMMARY JUDGMENT TO DEFENDANTS

I will grant summary judgment if there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). I view facts in the light most favorable to plaintiffs, the nonmovants. *Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011). I must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). For reasons that I explain, plaintiffs cannot prove their unilateral mistake claim. Even if they could, they acted unreasonably barring their claim.

### A. Plaintiffs cannot prove a unilateral mistake

Delaware law governs all the contracts here. *See, e.g.*, D.I. 126-1 at 105. Delaware courts can reform a contract "to express the 'real agreement' of the parties involved" when there is a unilateral mistake. *In re 11 W. Partners, LLC*, No. CV 2017-0568, 2019 WL 1300859, at *5 (Del. Ch. Mar. 20, 2019) (internal quotation marks omitted); *AECOM v. SCCI Nat'l Holdings, Inc.*, No. CV 2022-0727, 2023 WL 6294985, at *4 (Del. Ch. Sept. 27, 2023). To get reformation based on a unilateral mistake, the moving party must show by clear and convincing evidence "(1) that the party was mistaken about the contents of the final, written agreement; (2) that either its counterparty was similarly mistaken or that the counterparty knew of the mistake but remained silent so as to take advantage of the error; and (3) that there was a specific meeting of the minds regarding a term that was not accurately reflected in the final written agreement." *In re 11 W. Partners, LLC*, 2019 WL 1300859, at *5; *see also Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 679–80 & n.54 (Del. 2013).

Plaintiffs' argument boils down to asserting that they never would have accepted the 50%-payout provision because they wanted the unlimited upside that comes with owning equity. They say that provision made it into the amended notes only because of a mistake. But they cannot prove prongs two and three above.

Start with prong three. Plaintiffs have failed to show that the two sides "came to a specific prior understanding that differed materially from the written agreement." *Glidepath Ltd. v. Beumer Corp.*, No. CV 12220, 2018 WL 2670724, at *13 (Del. Ch. June 4, 2018) (internal quotation marks omitted). As Kanuri testified, no writing

shows that the parties agreed to remove the 50%-payout provision. D.I. 126-1 at 93–95 (tr. 300:23–302:15). To the contrary, the negotiations show that the parties haggled over how much the doctors would invest in their second round, but they ultimately chose a safer option with minor amendments to the original convertible notes. D.I. 126-1 at 182–209. No part of that proposal touched the payout provision. D.I. 126-1 at 217–18.

And for their part, defendants thought that the payout provision remained unchanged. Before sending the amended notes agreement to the doctors, Movva told his chief financial officer to "just apply a cap" in the new notes because "conversion is already spelled out in the existing notes." D.I. 126-2 at 55. So the minds did not meet about removing the payout provision.

Resisting that conclusion, plaintiffs rely on Kanuri's testimony that he orally agreed with Movva to remove the 50%-payout provision. D.I. 126-1 at 94–95 (tr. 301:20–302:8). But "self-serving deposition testimony," like Kanuri's, "is insufficient to raise a genuine issue of material fact" given all the other evidence that swings the other way. *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011). His testimony contradicts the extensive written negotiations: the two sides did not negotiate the deal orally "a hundred percent of the time." D.I. 126-1 at 94 (tr. 301:24–25); *see, e.g.*, D.I. 126-1 at 182–209 (extensive written negotiations). And tossing out the writing for these illusory oral negotiations would undermine Delaware's contract-law policy: "When an experienced party does not bother to read what he knows will be the binding agreement, a court must be exceedingly careful before allowing him to escape

8

the consequences of that agreement, lest the court undercut the reliability of all written contracts, a reliability critical to their important role in facilitating useful commercial relations." *Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 711 (Del. 2019).

Plaintiffs also argue that these negotiations for a second-round investment make no sense unless the doctors' first round investment would convert to equity. But plaintiffs' own behavior undermines that argument. Defendants offered second-round investment options that would have converted plaintiffs' debt to equity and plaintiffs rejected those options. D.I. 126-1 at 217–18, 229, 232. Instead, the doctors picked a safer investment, showing that they were not singularly focused on converting their debt notes to equity. *Id.*

In opposing the motion to dismiss, plaintiffs relied on emails from Movva to plead that Movva had agreed to remove the payout provision and then did not. Out of context, these emails could be read to refer to the payout provision. D.I. 69 at 6–8. But in context, Movva was referring to proposed contracts that would have converted the original notes into equity. Movva had not "appreciated [the] nuance" of some language about protecting the doctors' downside risk if the company was sold. D.I. 126-1 at 219. But, as explained in the prior paragraph, plaintiffs ended up rejecting that investment deal, and that language was not directly relevant to the payout provision in the amended notes.

To sum up, unilateral mistake "is not an equitable license for the Court to write a new contract at the invitation of a party who is unsatisfied with his or her side of the

9

bargain." *In re TIBCO Software Inc. Stockholders Litig.*, No. CV 10319, 2015 WL 6155894, at *13 (Del. Ch. Oct. 20, 2015). Plaintiffs never got defendants to agree to remove the payout provision. The "true agreement" is just what they agreed to within the four corners of the contract, including the payout provision. There is no unilateral mistake.

Plaintiffs also fail on the second prong because they cannot show that defendants were mistaken or knew of the mistake but remained silent to gain from it. Plaintiffs had agreed to the payout provision once in the original notes, giving defendants little reason to suspect that they were so hostile to it. D.I. 126-1 at 100, 112. What is more, plaintiffs never directly told defendants to remove the provision. *See JJS, Ltd. v. Steelpoint CP Holdings, LLC*, No. CV 2019-0072-KSJM, 2019 WL 5092896, at *10 (Del. Ch. Oct. 11, 2019). And the provision was prominent in the notes agreement, listed on the second page. *Id.* at *10. "The fact that Plaintiffs had the opportunity to but did not oppose the [payout provision] … undercuts the argument that their counterparties knew Plaintiffs were mistaken" when agreeing to it later. *Id.*

Plaintiffs respond that Movva acted in bad faith to make the deal more favorable for him and DivvyDose. D.I. 128 at 20. Not so. True, Movva was exceedingly polite throughout the negotiations, stating that he wanted every investor in DivvyDose to do well. D.I. 126-1 at 218 ("We don't want anyone to feel rushed and want to make sure everyone understands everything."), 220 ("I do want you all to feel good about your investments and I hope in the end you do."). But repeatedly saying he wanted them to do well is consistent with including a 50%-payout provision: that provision

10

guaranteed the two doctors a large profit in case of a buyout. Even though Movva privately was exasperated with the two doctors' changing positions during the negotiations, he fulfilled his duty of good faith. D.I. 128-1 at 27. He even implored the doctors to "take your time with [the proposed amended notes] … [w]e've tried to be very careful about not including or excluding anything material." D.I. 126-1 at 226.

In a similar vein, plaintiffs assert that Movva concealed an impending sale of the company to cheat them out of some upside. D.I. 128 at 21–22. But this too misses the mark. During negotiations for the second investment round in July 2019, Movva forwarded the two doctors a message from the company's investment bankers, discussing "exciting news" about a potential merger. D.I. 126-1 at 156. This transparency discredits the doctors' argument that Movva was trying to deceive them. What is more, no acquisition offer came until January 2020, several months after the second transaction. And it did not close until September. D.I. 126-1 at 4–5 (tr. 55:20–24, 56:9–13). This long gap between the amended-notes negotiations and the acquisition offer suggests that Movva could not have been confident that an offer would materialize, let alone that a deal would close, undermining the doctors' unsupported theory that Movva had a motive to deceive them.

Plaintiffs also mischaracterize Matthew Combs' testimony. D.I. 128 at 7, 16–17. As the Chief Financial Officer of DivvyDose, Combs assisted Movva in the investment negotiations. *See, e.g.*, D.I. 126-1 at 220. But none of his testimony shows that he or the company knew the doctors wanted to remove the 50%-payout provision. True, he described how the initial negotiations were about an equity investment to trigger

11

conversion. D.I. 128-1 at 81 (tr. 176:3–7). But the doctors rejected that option as too risky. D.I. 126-1 at 217–18. And of course, Combs knew about the 50%-payout provision; he had probably read the contracts. D.I. 128-1 at 84–85 (tr. 207:1–208:10). But merely knowing what the contract says does not show that Combs knew what was in the doctors' heads. In fact, Combs testified that there was no reason he would have known to get rid of the payout provision because the two sides "never discussed" it. D.I. 135-1 at 7 (tr. 206:3–10). For these reasons, plaintiffs cannot prove a unilateral mistake.

### B. Plaintiffs acted unreasonably

Even if plaintiffs could prove their unilateral-mistake claim, their failure to act reasonably and in good faith bars it. "[A] failure to read bars a reformation claim … only if the plaintiff's fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." *Parke Bancorp*, 217 A.3d at 711 (cleaned up). At the motion-to-dismiss stage, there was good reason to think that plaintiffs had acted unreasonably. D.I. 69 at 10. Discovery has confirmed that.

Plaintiffs failed to read the contracts. Bikkasani explained, "I did not even ask what are the terms of the investment. I said, 'Ok, I'll invest it.'" D.I. 126-1 at 35 (tr. 82:2–4). He "didn't even look at" the documents before signing. D.I. 126-1 at 35 (tr. 82:7–9). When referring to the change of control clause with the 50%-payout provision, Kanuri stated: "I don't believe I looked at any of this." D.I. 126-1 at 85 (tr. 113:10–11).

This failure is astonishing. Everyone expects investors to read their deals. The doctors are sophisticated, accredited investors buying unregistered securities. In the

contract, they represented that they have "such knowledge and experience in financial and business matters" so that they were "capable of evaluating the merits and risk of this investment." D.I. 126-1 at 267. They chose not to seek "a legal or professional opinion" on the investments. D.I. 126-1 at 211. They must face the consequences of this unreasonable behavior.

Trying to explain away their unreasonable actions, the doctors argue that they did not have to read the contracts because as "mere investors" and family friends with Movva they did not have to act reasonably or in good faith. D.I. 128 at 19, 22. They cite no authority for either notion. And doing away with the good-faith and reasonable-conduct requirements would gut basic principles of contract law. *Parke Bancorp*, 217 A.3d at 711.

As the doctors admit, "[n]one of us bothered to check the documents before signing." D.I. 128-1 at 62. They should have bothered. Because they acted unreasonably, I grant summary judgment to defendants.

### III. I WILL EXCLUDE PORTIONS OF PLAINTIFFS' EXPERT REPORT

Defendants ask me to exclude plaintiffs' expert report. D.I. 117. They argue the plaintiffs' expert, Jim Timmins, testifies to the ultimate issue and does so without any supporting methodologies. D.I. 118 at 6, 12–13. They also say he retracted his opinion that the payout provision is not a standard, market term. *Id.* at 6. Their first objection is right.

Timmins does testify to the ultimate legal issue. He testifies the "parties agreed that … all of Plaintiffs investments would be entitled to convert into an equity interest …. The Defendants … failed to implement the change; but they created the

13

impression that the change had been implemented." D.I. 119-1 at 8–9 (¶ 22). That testimony addresses key elements of reformation based on unilateral mistake: a specific meeting of the minds about the payout provision and whether defendants ignored the mistake to mislead plaintiffs. Because "an expert witness is prohibited from rendering a legal opinion," I will exclude this testimony. *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). This testimony would not help the jury reach the truth because it tells them how to apply the law to the facts. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). So I exclude all the portions of Timmins's report that render legal opinions. But it makes no difference. Even if I were to admit this evidence, I would still find that the doctors acted unreasonably and thus still grant summary judgment to defendants.

But I will not exclude Timmins's testimony about whether the payout provision is a standard, market term. True, Timmins waffled on and likely retracted this testimony. *Compare* D.I. 119-1 at 12 (¶ 39) (the payout provision is "not a market standard term") *with id.* at 54 (tr. 105:1–7) ("No, I'm not asserting that."). And it is implausible that a term must appear in at least half of transactions to be a standard, market term, which plaintiffs suggest. D.I. 127 at 6. A reasonable factfinder would probably find Timmins' testimony incredible, but it is still admissible. Courts should let juries "weigh expert testimony that presents reliability issues that can be understood on the basis of logic or commonsense." 29 Charles Alan Wright, Arthur R. Miller & Victor J. Gold, *Federal Practice and Procedure* § 6265.3 (2d ed. 2024).

Still, letting in this testimony creates no material dispute of fact. *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (noting that these are separate questions). As plaintiffs concede, whether the payout provision is a market term is a "tangential issue." D.I. 127 at 5. It does not bear on whether the parties agreed to anything specific. Plus, the two doctors still acted unreasonably by failing to read the contracts. So this part of the report does not create a material dispute of fact and is otherwise irrelevant.

\* \* \* \* \*

Plaintiffs cannot prove their unilateral-mistake claim. They also acted unreasonably: They "all signed the documents without actually reading the final docs to see it had [sic] all the features [they] negotiated." D.I. 128-1 at 63. So I grant defendants summary judgment.